## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 24-3277 |
| | ) | |
| Plaintiff-Appellee, | ) | On appeal from the U.S. District |
| | ) | Court for the Northern District of |
| vs. | ) | Ohio, Case No. 5:09-CV-00272 |
| | ) | |
| CITY OF AKRON, OHIO, | ) | |
| | ) | |
| Defendant-Appellant, | ) | |
| | ) | |
| STATE OF OHIO, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

## APPELLANT CITY OF AKRON'S
## MOTION FOR STAY PENDING APPEAL

Pursuant to Fed. R. App. P. 8(a), Appellant City of Akron, Ohio ("Akron"), hereby moves for the Court to issue an Order staying Akron's obligation to design and construct a $209 million Enhanced High Rate Treatment ("EHRT") facility pending appeal from the district court's denial of Akron's motion to modify a 2014 Consent Decree under Fed. R. Civ. P. 60(b)(5). Here, as discussed more fully in the attached Brief, a stay is appropriate to preserve the status quo and prevent the irreparable injury that would result if Akron were forced to incur the substantial cost of constructing a $209 million facility that no longer needs to be built in order to ensure that Akron's sewer system complies with the Clean Water Act and U.S. EPA's Combined Sewer Overflow Policy, 75 Fed. Reg. 18688 (Apr. 19, 1994).

Prior to filing this stay motion with this Court, Akron first filed a stay motion in the district court on April 1, 2024. (Doc.#392, Akron's Motion to Stay, dated 4/1/2024). Upon review, the district court issued an Order on April 23, 2024, that denied Akron's stay motion. (Doc.#400, Order, dated April 23, 2024, PageID# 41429-41435). Accordingly, Akron now moves under Fed. R. App. P. 8(a) for appropriate relief from this Court. A Brief in Support of this Stay Motion is attached for the Court's review and consideration.

Dated: April 30, 2024                    Respectfully submitted,

                                         */s/   Stephen W. Funk*
                                         Stephen W. Funk (0058506)
                                         Terrence S. Finn (0039391)
                                         Roetzel & Andress, LPA
                                         222 South Main Street
                                         Akron, OH  44308
                                         Telephone: 330.376.2700
                                         Email:  sfunk@ralaw.com

                                         *Attorneys for Defendant-Appellant*
                                         *City of Akron, Ohio*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................1

STATEMENT OF FACTS ....................................................................4

    A.    The Original 2014 Consent Decree And Its Central Purpose ..............4

    B.    Summary Of The EHRT Requirement In LTCP Update .....................7

    C.    Akron's Motion to Modify The Consent Decree ...............................10

        1.    Summary Of Akron's Evidence Relating To Compliance With CSO Policy And Ohio's Water Quality Standards ..........10

        2.    Summary Of Akron's Proposed Alternative Projects ..............12

        3.    Summary Of US EPA's Position ...............................................14

    D.    The District Court's Order, dated March 1, 2024 ...............................15

LAW AND ARGUMENT ...................................................................16

I.    THE COURT SHOULD STAY AKRON'S OBLIGATION TO CONSTRUCT THE EHRT FACILITY UNTIL IT CAN DECIDE THE MERITS OF AKRON'S APPEAL.......................................................16

    A.    Standard of Review ...........................................................................16

    B.    The Court Should Rule That A Stay Has Already Been Granted By Paragraph 67 and 113 Of The Consent Decree ............................18

    C.    The Court Should Grant A Stay Based Upon A Balancing Of The Relevant Stay/Injunction Factors ................................................21

        1.    Akron Is Likely To Prevail On The Merits..............................21

        2.    Akron Will Suffer Irreparable Harm Absent A Stay ...............32

|   |   |   |
|---|---|---|
| 3. | A Stay Will Not Substantially Injure Any Third Parties ..........34 |
| 4. | The Public Interest Favors A Stay ...............................................35 |

II.   THE COURT SHOULD NOT REQUIRE AKRON TO POST A
BOND AS A CONDITION FOR GRANTING A STAY ...........................35

CONCLUSION .........................................................................................................36

CERTIFICATE OF COMPLIANCE .......................................................................37

PROOF OF SERVICE ..............................................................................................38

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                          **<u>Page</u>**

*A. Philip Randolph Institute v. Husted*, 907 F.3d 913 (6th Cir. 2018) ............. 17, 18

*Commonwealth v. Beshear*, 981 F.3d 505 (6th Cir. 2020) ......................................17

*Horne v. Flores*, 557 U.S. 433, 129 S.Ct. 2579 (2009)................................. 3, *passim*

*Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 355 F.3d 574
    (6th Cir. 2004) ................................................................................................18

*Livingston Educational Service Agency v. Becerra*, 35 F.4th 489
    (6th Cir. 2022) ................................................................................................17

*Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*,
    945 F.2d 150 (6th Cir. 1991) ................................................................ 3, 17, 18

*Ohio v. Becerra*, 87 F.4th 759 (6th Cir. 2023) ......................................................4, 32

*Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367 (1992)...................... 3, *passim*


**<u>Statutes</u>**

Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a) ....................................4

Section 402(q) of the Clean Water Act, 33 U.S.C. § 1342(q) .................... 1, *passim*


**<u>Regulations</u>**

U.S. EPA's Combined Sewer Overflow Control Policy,
    75 Fed. Reg. 18688 (Apr. 19, 1994). .................................................... 1, *passim*


**<u>Rules</u>**

Federal Rules of Appellate Procedure, Rule 8(a) ........................................... 16, 35

Federal Rule of Civil Procedure 60(b)(5) ..................................................... 1, *passim*

## **INTRODUCTION**

As previously discussed, this Motion requests that the Court stay Akron's obligation to design and construct a $209 million EHRT facility pending appeal from the district court's denial of Akron's motion to modify a 2014 Consent Decree under Fed. R. Civ. P. 60(b)(5). Here, a stay is appropriate to preserve the status quo and prevent the irreparable injury that would result if Akron were forced to incur the substantial cost of designing and constructing a $209 million treatment facility that no longer needs to be built in order to ensure that Akron's sewer system complies with the Clean Water Act ("CWA") and U.S. EPA's Combined Sewer Overflow Policy, 75 Fed. Reg. 18688 (Apr. 19, 1994) (the "CSO Policy").

As discussed more fully below, Section 402(q) of the CWA, 33 U.S.C. § 1342(q), mandates that consent decrees must conform to the CSO Policy, and the CSO Policy itself provides for the imposition of "***cost-effective*** CSO controls" based upon "an analysis to determine where the ***increment*** of pollution reduction achieved in the receiving water diminishes ***compared* to the increased costs**." *See* CSO Policy, 75 Fed. Reg. at 18688, 18693 (emphasis added). Here, Akron has presented a cost performance curve in accordance with the CSO Policy to show that the EHRT is *no longer a cost effective* control due to the substantial reduction of the number of overflows and the increased cost of the facility. (Doc. #371-3, Declaration of Patrick Gsellman ¶ 31, Ex. 3, PageID#39921, PageID#40015).

The United States presented <u>no</u> evidence to dispute this cost performance analysis. While United States has argued that the EHRT facility is still necessary to comply with Akron's NPDES Permit and Ohio's water quality standards, the Ohio Environmental Protection Agency ("Ohio EPA") – the regulatory agency that issued Akron's NPDES Permit and adopted Ohio's water quality standards – has <u>disagreed</u>, and has determined that, even without the EHRT, Akron will now be in substantial compliance with Ohio's water quality standards, and that the $209 million facility is no longer a "cost effective or appropriate" remedy. (Doc.#373-2, Declaration of Ashley Ward, Ohio EPA Asst. Section Chief, Division of Surface Water, ¶ 7-12, PageID#40133-40136).

In this regard, it is important to emphasize that Paragraph 67 of the Consent Decree expressly provides for a <u>stay</u> whenever there is a dispute in which the United States and Ohio have adopted "materially different or irreconcilable positions," including but not limited to a dispute between the United States and Ohio over a proposed modification of the Consent Decree under Paragraph 113. (Doc.#155, 2014 Consent Decree, ¶ 67, PageID#7252, and ¶ 113, PageID#7266-7267). Accordingly, by operation of Paragraphs 67 and 113 of the Consent Decree, the Court should rule that Akron's obligation to construct the EHRT facility has been stayed until after the appellate process has been completed and the dispute presented by Akron's proposed modification has been resolved.

Even if Paragraph 67 does not apply, however, the fact remains that a stay nevertheless should be granted under the traditional four-factor analysis that applies to stays and injunctions pending appeal. *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). Here, as will be demonstrated below, Akron has presented a number of legal reasons for why the Consent Decree should be modified under the standards adopted by the Supreme Court in *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367 (1992). While the district court held that the Consent Decree should be enforced because it imposes *higher* environmental standards than "the ***baseline*** of EPA's CSO policy," this ruling conflicts with the Supreme Court's ruling in *Rufo* and *Horne v. Flores*, 557 U.S. 433, 129 S.Ct. 2579 (2009), which held that federal courts must take a "flexible approach" to Rule 60(b)(5) motions to modify consent decrees and "must remain attentive to the fact that 'federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation.'" *Id.* at 450 (citations omitted). Thus, if Akron is ultimately successful in demonstrating that it can comply with the CSO Policy, even without the EHRT, then it should not be forced to incur the substantial and unrecoverable expense of constructing a $209 million facility that is no longer a necessary or cost-effective remedy under the CSO Policy.

Further, as discussed below, the remaining three factors (irreparable injury, harm to others, and public interest) weigh in favor of a stay. Here, absent a stay, Akron will be required to move forward with the EHRT project and enter into one or more contracts for the design and construction of the facility in order to meet the Consent Decree's deadlines. (Doc 392-2, Declaration of Chris Ludle, ¶ 6-7, PageID#41366). Moreover, due to the impending deadlines, Akron will need to incur debt obligations, begin paying significant sums for equipment, and commence a significant amount of site work for the Project. (*Id.* at ¶ 7-9). All of this significant construction work and financial expense, however, will be <u>unnecessary</u> and <u>unrecoverable</u> if Akron ultimately prevails on appeal. This is the definition of <u>irreparable</u> harm. *See Ohio v. Becerra*, 87 F.4th 759, 782-783 (6th Cir. 2023) (finding that State of Ohio would incur irreparable harm because "economic injuries caused by federal agency action are generally unrecoverable"). Accordingly, for all of these reasons and for the additional reasons discussed below, the Court should grant Akron's Motion to Stay Implementation of the EHRT requirement pending appeal.

## STATEMENT OF FACTS

### A.    The Original 2014 Consent Decree And Its Central Purpose

This civil action was commenced over 15 years ago on February 5, 2009, based upon the allegation that Akron's sewer collection system violated Section 301(a) of the CWA and Akron's National Pollution Discharge Elimination System

("NPDES") permit. (Doc.#1, Compl. filed 2/5/2009, PageID#1).  The Complaint essentially alleged that Akron allowed the discharge of pollutants from Combined Sewer Overflow ("CSO") points in violation of the federal and state Clean Water Acts and the CSO Policy. (Doc.#4, Amd. Compl., pp. 8-13, PageID#30-35). Instead of litigating the claims, the Parties engaged in negotiations that resulted in a Consent Decree that was originally submitted in 2009 and ultimately approved, after an appeal, on January 17, 2014.  (Doc.#155, Consent Decree, PageID#7211-7328).

As set forth in Paragraph 1, the stated purpose of the Consent Decree is "to further the objectives of the Act ... and the objectives of Chapter 6111 of the Ohio Revised Code, and "***to meet the objectives of the Combined Sewer Overflow Control Policy***".  (*Id.* at ¶ 1, PageID#7216) (emphasis added).  Indeed, under Section 402(q)(1) of the Clean Water Act, Congress has mandated that "[e]ach permit, order, ***or decree*** issued pursuant to this chapter after December 21, 2000, for a discharge from a municipal combined storm and sanitary sewer shall conform to the" CSO Policy.  *See* 33 U.S.C. § 1342(q)(1) (emphasis added).  Thus, compliance with the CSO Policy is the clear objective of both the CWA and the Consent Decree.

Most of the control measures required by the Consent Decree are set forth in a 2011 Long Term Control Plan ("LTCP") Update.  (Doc.#123-2, 2011 LTCP Update, PageID#6388-6429).  The 2011 LTCP Update contains a summary table with rows with each row constituting a separate and unique project.  Akron has now completed

24 of the 26 projects required by the Consent Decree with the exception of (i) the EHRT facility required under LTCP Update Row 11.a, and (ii) the Northside Interceptor Tunnel ("NSIT") under Row 12, which is currently under construction. (Doc.#371-3, Gsellman Decl. ¶¶ 16, 18, PageID#39916-17); (Doc.#373-2, Ward Decl. ¶ 1, PageID#40133). Once the NSIT is fully constructed, Akron will have incurred over $1 billion to implement the Consent Decree. (Doc.#371-3, Gsellman Decl. ¶ 21, PageID#39919). As a result, Akron's sewer system will be eliminating or capturing 99% of the wet weather flows, and reducing the overall volume of sewer and secondary bypass outflows from 2.4 billion gallons to less than 100 gallons per year, even if the EHRT facility is not built. (*Id.* at ¶ 28, PageID#39920).

As the State of Ohio explained in the district court, Akron's sewer improvements have "produced significantly greater controls than originally anticipated." (Doc.#373-1, State of Ohio Mem., pg. 1, PageID#40114). Indeed, due to the $1 billion in improvements to Akron's sewer system, the Ohio EPA has determined that Akron has now achieved an "extraordinary high level of control" that is "well within the guidelines of the CSO Policy." (*Id.* at 8, PageID#40121); Accordingly, due to this significant change in circumstances, Ohio EPA has determined that the EHRT facility is no longer a "cost effective or appropriate" remedy and "will not be necessary to attain compliance" with Ohio's water quality standards. (Doc.#373-2, Ward Decl. ¶ 6-12, PageID#40133-36).

6

**B.    Summary Of The EHRT Requirement In LTCP Update**

With respect to the EHRT requirement, Row 11.a of the LTCP Update requires the installation of an "ACTIFLO ballasted flocculation unit or equivalent technology that meets the Design and Performance Criteria and Disinfection," which is commonly referred to as an Enhanced High Rate Treatment facility, or "EHRT." (*See* Doc.#371-3, Gsellman Decl. ¶ 22, PageID#39919). The EHRT is intended to treat the overflows from the Ohio Canal Interceptor Tunnel ("OCIT"), which is the control measure required under Row 11 that has already been constructed.  (*Id.*)

When this EHRT project was originally included in the 2011 LTCP Update, Akron's hydraulic planning models estimated that there would be seven (7) overflow events from the OCIT, with a total volume of approximately 191 million gallons, in a typical year, and that the EHRT facility would cost only $56 million.  (Doc.#371-3, Gsellman Decl. ¶¶ 23, 30 PageID#39919-39920); (Doc.#373-2, Ward Decl. ¶ 1, PageID#40133).  However, based upon the sewer improvements that have been constructed and based upon an updated and far more accurate hydraulic model, it is now estimated that, even if the EHRT facility were not built, there now will be only three (3) overflow events from the OCIT in a typical year, and only two (2) overflow events during the recreational season. (Doc.#373-2, Ward Decl. ¶ 4-5, PageID#40133); (Doc.#371-3, Gsellman Decl. ¶ 23-30, PageID#39919-39920); (Doc.#371-4, Declaration of Christopher Miller, Ph.D., P.E., ¶ 16, PageID#40661).

Moreover, because Akron has proposed to increase the dewatering rate from the OCIT as part of its proposed modification, the predicted annual overflow volumes will be reduced even further to 62.1 million gallons in a typical year. (Doc.#373-2, Ward Decl. ¶ 18, PageID#40137); (Doc.#371-4, Miller Decl. ¶ 15, PageID#40060). As a result, the number of sewer overflows are now in compliance with CSO Policy and actually *less* the number of sewer overflows authorized for the Northeast Ohio Sewer District (Cleveland), Columbus, Toledo, and Lima, which are allowed four or five overflows in a year. (Doc. #373-1, State of Ohio Mem. pg. 10, PageID#40123); (Doc.#373-3, Declaration of David Brumbaugh, ¶ 16, PageID#40143-40144).

In proceedings below, the U.S. EPA has argued that three (3) sewer outflows does not comply with the CSO Policy because it allegedly does not comply with Akron's NPDES Permit and Ohio's water quality recreational use standards. This position, however, conflicts with the undisputed evidence in the record and the position taken by the Ohio EPA – the regulatory agency that actually issued Akron's NPDES Permit and Ohio's WQS – which has determined that the volume of Akron's sewer overflows without the EHRT "will be within .08% of its allocated wasteload for bacteria under the Total Maximum Daily Load ("TMDL") for the lower Cuyahoga River. (Doc.#373-1, State of Ohio Mem., pg. 10, PageID#40123); (Doc.#373-2, Ward Decl. ¶ 10-12, PageID#40135); (Doc.#373-3, Brumbaugh Decl. ¶ 17, PageID#40144). This difference, in fact, would be further reduced to 0.04% if

Akron reduces the overflows at the OCIT to 62.1 million gallons and converts the Cuyahoga Street Storage Facility to a disinfection facility, as proposed. (Doc.#371-3, Gsellman Decl. ¶ 33 and ¶ 38, PageID#39921-39923). The United States presented no evidence to dispute these TMDL calculations. Thus, given that Akron's bacteria load is now *de minimis*, and that 99.75% of the bacteria in the Cuyahoga River comes from **_other_** sources, the Ohio EPA has determined that "[c]onstruction of the EHRT would have little impact on the river's overall bacteria load." (Doc.#373-1, State of Ohio Mem. pg. 10, PageID#40123).

It is further undisputed that the estimated cost of constructing the EHRT has *increased* from $56 million in 2011 to over $209 million in 2023. (Doc.#373-3, Gsellman Decl. ¶ 29-30, PageID#39920-39921). Indeed, even when inflation has been taken into account, the U.S. EPA's economic consultant has determined that the cost of the EHRT has increased by over $131 million in real dollars since it was originally agreed to by the parties in 2011. (Doc.#374-2, Declaration of Gail B. Coad, ¶ 5). At that time, however, the Parties anticipated that there would be over 7 overflows (191 million gallons), not 3 overflows (62 million gallons), as currently projected, which is now in conformance with the CSO Policy and Ohio's water quality standards. (Doc.#373-2, Ward Decl. ¶ 6-7 and ¶ 12, PageID#40133-401336); (Doc.#373-3, Brumbaugh Decl. ¶ 15-17, PageID#40143-40144).

**C.    Akron's Motion to Modify The Consent Decree**

   **1.    Summary Of Akron's Evidence Relating To Compliance With CSO Policy And Ohio's Water Quality Standards.**

Akron first proposed to modify the Consent Decree in 2021, and in 2022 initiated the dispute resolution procedures for modifications set forth in Paragraph 67 and 113 of the Consent Decree.  In support of this proposed modification, Akron argued that continued enforcement of the EHRT would not be a cost-effective remedy under the CSO Policy, and presented evidence to show how it would be in compliance with the CSO Policy, even without the EHRT.

In particular, the CSO Policy provides for two (2) alternative methods for determining compliance: (1) the "demonstration approach" and (2) the "presumption approach." (Doc.#373-3, Brumbaugh Decl. ¶ 10, PageID#40142) (citing CSO Policy, 59 Fed. Reg. at 16888).  Here, Akron satisfies both methods.

**a.    Presumption Approach**

First, under the presumption approach, the CSO Policy provides "no more than an average of **four** overflow events per year, provided that the permitting authority may allow up to two additional overflow events per year," **or** "the elimination or capture for treatment of no less than 85% by volume of the combined sewage collected in the CSS during precipitation events on a system-wide annual average basis." CSO Policy at 18692.  Here, since Akron will experience only 3 overflows in a typical year, and would be controlling 99% of its wet weather flow, Akron has satisfied the

"presumption" approach in the CSO Policy.  (Doc.#373-1, State Mem. pp. 8-9, PageID#40121-22); (Doc.#373-3, Brumbaugh Decl. ¶ 11, PageID#40142).

### b.     Demonstration Approach

Second, under the demonstration approach, the CSO Policy provides that permittees that have overflows that exceed 4-6 per year may demonstrate compliance by showing that their program is adequate to satisfy the applicable water quality standards ("WQS").  (Doc.#373-3, Brumbaugh Decl. ¶ 12, PageID#40142-40143).  Here, while the Cuyahoga River is a sensitive area because it is subject to Ohio's WQS recreational use criteria, the Ohio EPA has determined that Akron satisfies Ohio's water quality standards based upon the total maximum load allocations adopted for the Cuyahoga River.  (Doc.#373-2, Ward Decl. ¶ 11-12, PageID#40135). Thus, Akron also has satisfied the demonstration approach under the CSO Policy. (Doc.#373-3, Brumbaugh Decl. ¶ 12-14, PageID#40142-40143).

### c.     Cost-Effectiveness

In addition to presenting evidence relating to the presumption and demonstration approaches, Akron also presented evidence to show why the EHRT is no longer a cost-effective remedy under the CSO Policy.  (Doc.#371-3, Gsellman Decl. ¶ 31, Ex. 3, PageID#39221, PageID#40015).  This demonstration was not presented in the abstract, but was prepared in accordance with the plain language of the CSO Policy, which requires "an analysis to determine where the increment of

pollution achieved in receiving water diminishes compared to compared to increase costs."  CSO Policy, 59 Fed. Reg. at 18693.

Here, based upon the new data relating to the reduction in the number of sewer overflows and the substantially increased cost of the EHRT facility, Akron developed an updated cost performance curve that shows that treatment of three (3) overflow events is at the "knee of the curve" or the point at which the increment of pollution reduction achieved diminishes when compared to the increased costs. (Doc.#371-3, Gsellman Decl. Ex. 3, PageID#40015).  The United States presented no evidence to dispute this cost performance analysis.  Accordingly, given the undisputed evidence that the EHRT facility is no longer a cost-effective remedy, it is Akron's position that it would <u>violate</u> both the CSO Policy and the CWA to require Akron to spend $209 million to build this facility. (Doc.#371-3, Gsellman Decl. ¶ 31, PageID#39221); (Doc.#373-2, Ward Decl. ¶ 7, PageID#40133).

### 2.    Summary Of Akron's Proposed Alternative Projects.

Given that Akron was within .08% of its allocated load for bacteria under the TMDL allocation under Ohio's water quality standards, and that 99.75% of the bacteria in the Cuyahoga River comes from *other* sources, Akron's proposed modification provided that, in lieu of constructing a new $209 million EHRT facility to treat three potential overflows per year, it would actually be more effective for Akron to use its limited resources to implement more targeted measures that would

actually _reduce_ the amount of daily bacteria currently discharging into the Cuyahoga River from other sources.  In so doing, Akron sought to provide immediate, real-world benefits to the Cuyahoga River that would actually reduce the bacteria load.

In particular, Akron proposed four (4) alternative projects that would cost approximately $30 million and provide superior environmental benefits to the Cuyahoga River watershed, including the elimination of a large number of privately-owned wastewater facilities and septic systems in the Village of Peninsula and sanitary overflows in the Village of Lakemore that are directly and daily impacting the Cuyahoga River.  (Doc.#371-5, Declaration of Emily Collins, ¶ 12-20, Ex. 1, PageID#40063-40073).  In this regard, Akron's proposed modification of Row 11.a set forth specific details of the alternative projects, including design criteria, performance criteria, and critical milestones.  (Doc.#371-2, Proposed Modification, PageID#39913-39914).  Moreover, the details of the alternative projects were set forth the Declaration of Emily Collins and the MOU attached to her Declaration.  (Doc.#371-5, Collins Decl. ¶ 16, Ex. 1, PageID#40064-65 and PageID#40068-73).

While the district court found that Peninsula and Lakemore already have an obligation to implement these alternative projects, it is undisputed that the two Villages do not have the funding to pay for the projects, and thus, Akron's proposed modification would ensure that the alternative projects would be completed in a timely manner and in accordance with legally enforceable deadlines.  (Doc.#371-5,

Collins Decl ¶ 19, PageID#40066).   As a result, over 280 stakeholders have submitted letters in support of Akron's proposed modification, including the Cuyahoga Valley National Park ("CVNP"), the Summit County Metro Parks, and the Friends of Crooked River, because they recognize that alternative projects will provide significantly greater water quality benefits to the Cuyahoga River.  (*Id.* at ¶ 20, PageID#40066, and Ex. 2-4, PageID#40075-40080).[1]

### 3.    Summary Of US EPA's Position

On March 9, 2023, Akron submitted a revised request for modification to the US EPA that set forth Akron's justification for elimination of the EHRT requirement and the details of the proposed alternative projects.  In a meeting on June 23, 2023, however, the U.S. EPA determined that, regardless of the cost increases and reduction in outflows, it would not agree to any modification unless it resulted in zero outflows from the OCIT.   (Doc.#373-2, Ward Decl. ¶ 19, PageID#40137-40138).  This arbitrary and overly restrictive position, however, does not align with the CWA and the CSO Policy, which does not require strict compliance, but provides for cost-effective CSO controls.  *See* CSO Policy, 75 Fed. Reg. at 18688.

---

[1]  After the Superintendent of the CVNP signed a letter on August 16, 2023, to in support for Akron's modification, the United States submitted a Declaration from Lisa Petit in which she takes "no position" on Akron's modification. (Doc.#374-3, Petit Decl. ¶ 9, PageID#40484).  This change in position actually provides further support for Akron's position because the Superintendent would be opposing the modification if she truly believed that it would cause harm to the CVNP.  (*Id.*)

**D.      The District Court's Order, dated March 1, 2024**

In its Order, the District Court also refused to modify the Consent Decree unless it provided for *zero* overflows from the OCIT.   (Doc.#390, Order, dated 3/1/2024, PageID#41328-41343).   In so doing, however, the District Court did not consider the mandatory requirement in the CSO Policy to adopt "cost-effective CSO controls," and did not discuss the cost performance analysis that had been submitted by Akron in accordance with the CSO Policy.   Rather, the District Court wrongfully framed Akron's cost-effectiveness argument as a mere "force majeure" argument, which not only misinterprets the Consent Decree itself, but misconstrues the legal standards governing a Rule 60(b)(5) motion under *Rufo*.   (*Id.* at 10-13, PageID#41338-41340).   Moreover, the District Court failed to explain how a zero-overflow result is required by the CSO Policy, Akron's NPDES Permit, or Ohio's water quality standards.   (*Id.* at 10).   Thus, as discussed below, there are a number of legal issues presented by the District Court's Order that will be subject to *de novo* review on appeal, including whether the District Court (i) misconstrued and misapplied the legal standards governing a motion to modify a consent decree under *Rufo* and *Horne*; (ii) misconstrued and misapplied the CSO Policy and Ohio's water quality standards; and (iii) misconstrued and misapplied the Consent Decree itself.

## LAW AND ARGUMENT

**I. THE COURT SHOULD STAY AKRON'S OBLIGATION TO CONSTRUCT THE EHRT FACILITY UNTIL IT CAN DECIDE THE MERITS OF AKRON'S APPEAL**

### A. Standard of Review

This Motion has been filed under Fed. R. Civ. P. 8(a), which authorizes this Court to grant a "stay of the judgment or order of a district court pending appeal" and/or issue an "order suspending, modifying, restoring, or granting an injunction while an appeal is pending." *Id.* Here, there are two (2) separate and independent grounds for granting a stay of the EHRT requirement pending appeal.

First, a stay should be granted because Paragraph 67 of the Consent Decree provides that where, as here, the United States and the State of Ohio have adopted "materially different and irreconcilable positions" on an issue in dispute, then "Akron's obligations to perform an action necessarily affected by the materially different or irreconcilable positions . . . shall be stayed until the dispute is resolved." (Doc.#155, Consent Decree, ¶ 67, PageID#7252). This stay language applies to all disputes relating to the Consent Decree, including disputes over proposed modifications. (*Id.* at ¶ 113, PageID#7266). Accordingly, as set forth in Argument I.B. below, the Court does not need to engage in the traditional four-factor analysis because a stay already has been granted by Paragraph 67 of the Consent Decree until the appellate process has been completed and the "dispute" has been resolved.

16

Second, even if the Court determines that Paragraph 67 does not apply, it still should grant a stay under the applicable legal standards that ordinarily apply to a motion for a stay or injunction pending appeal.  In deciding whether to grant a stay pending appeal, this Court applies the following four (4) factors:  "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prosect that others will be harmed if the court grants a stay; and (4) the public interest in granting the stay."  *See Commonwealth v. Beshear*, 981 F.3d 505, 508 (6th Cir. 2020) (citing *Michigan Coalition*, 945 F.2d at 153).  This same four factors are also applied in deciding to grant an injunction pending appeal. *See Livingston Educational Service Agency v. Becerra*, 35 F.4th 489, 491 (6th Cir. 2022) (applying same factors in "deciding whether to grant an injunction pending appeal").

As this Court explained in *Michigan Coalition* and *A. Philip Randolph Institute v. Husted*, 907 F.3d 913 (6th Cir. 2018), the four traditional stay/injunction factors "are not prerequisites that must be met, but are interrelated considerations that must be balanced together."  *Id.* at 918 (citing *Michigan Coalition*, 945 F.2d at 153).  In so doing, "a movant need not always establish a high probability of success on the merits," and that "the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiffs will suffer absent a stay."  *Id.* at 919 (citing *Michigan Coalition*, 945 F.2d at 153-154).  Thus, while

the movant must "demonstrate more than the mere 'possibility' of success on the merits," a stay still may be granted so long as the movant shows, at a minimum, "serious questions going to the merits." *Id.*

Here, as discussed in Argument I.C. below, Akron has demonstrated more than a mere "possibility" that it will prevail on the merits.  Rather, it has raised a number of significant <u>legal</u> issues that will be subject to *de novo* review on appeal and, at a minimum, raise "serious questions going to the merits" of the District Court's Order.  Indeed, while the denial of Rule 60(b)(5) motion is ordinarily subject to an abuse of discretion standard of review, it is well-established that all questions of law are subject to "de novo" review.  *Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 355 F.3d 574, 583-84 (6th Cir. 2004).  Accordingly, given the significant legal issues presented by Akron's appeal, the Court should preserve the status of quo and prevent the irreparable injury that would result if Akron were forced to build a $209 million facility that is no longer necessary or appropriate under the CWA and CSO Policy.

### B.    The Court Should Rule That A Stay Has Already Been Granted By Paragraph 67 and 113 Of The Consent Decree.

While the Court ordinarily must conduct an analysis of the four (4) traditional stay factors in deciding whether to grant a stay pending appeal, this case is different because the Consent Decree itself already provides for a stay of Akron's obligation to perform an action whenever there is a dispute in which the United States and the

State of Ohio have adopted "materially different or irreconcilable positions," including but not limited to a dispute over a proposed modification of the Consent Decree under Paragraph 113.  (Doc.#155, Consent Decree, ¶ 67, PageID#7252, and ¶ 113, PageID#7266-7267).

In particular, Paragraph 67 of the Consent Decree provides that where, as here, the United States and the State of Ohio have adopted "materially different and irreconcilable positions" on the issue in dispute, then "Akron's obligations to perform an action necessarily affected by the materially different or irreconcilable positions . . . shall be stayed until the dispute is resolved."  (*Id.*)  This stay language applies not only to enforcing the existing terms of the Consent Decree; but also applies to any proposed modification of the Consent Decree because Paragraph 113 of the Consent Decree provides that "[a]ny disputes concerning modification of the Decree shall be resolved pursuant to Section IV of this Decree (Dispute Resolution)," and Paragraph 67, in turn, provides that "[i]f a dispute is subject to this Section," then Akron's obligation "to perform the action necessarily affected by the materially different or irreconcilable positions . . . shall be stayed until the dispute is resolved." (*Id.*) Accordingly, this Court does not need to engage in the traditional four factor test for a stay or injunction because Akron already has been granted a stay of the EHRT deadlines by Paragraphs 67 and 113 of the Consent Decree.  (*Id.*)

In proceedings below,[2] the United States has taken the position that Akron's obligation to construct the EHRT facility has not been stayed under Paragraph 67 because the proposed modification requires court approval, and thus Akron's obligation to construct the EHRT facility will not be "necessarily affected" by a dispute between the United States and Ohio over the proposed modification.  This is a meritless argument because it ignores the fact that Paragraph 67 expressly applies to any dispute over a proposed modification under Paragraph 113 of the Consent Decree, and does not limit the scope of the stay language to whether the dispute involves the enforcement of an existing term or the modification of an existing term. (Doc.#155, Consent Decree, ¶ 67, ¶ 112-113, PageID#7252 and 7266).  Moreover, the US EPA's argument ignores the fact that the District Court already approved the stay language in Paragraph 67 of the Consent Decree.  Thus, while a proposed modification to eliminate the EHRT requirement may require court approval under Paragraph 112 of the Consent Decree, the fact remains that Akron's obligation to perform the action that is the subject of the modification dispute is nevertheless "stayed until the dispute has been resolved."  (*Id.*)

---

[2]  Because the Parties disagree over the proper interpretation of Paragraph 67, Akron has invoked the alternative dispute resolution procedures under the Consent Decree to resolve this dispute.  The fact that this dispute over the proper interpretation of Paragraph 67 has not yet been resolved, however, does not mean that the Court should not take the plain language of Paragraphs 67 and 113 into account in determining whether to grant Akron's Stay Motion.

Similarly, it does not matter that the District Court denied Akron's motion to modify the Consent Decree. While the District Court may have decided the merits of the dispute over whether to modify the Consent Decree, the fact remains that the District Court's denial of a Motion to Modify a Consent Decree under Rule 60(b)(5) is subject to appellate review. Thus, the dispute will not be "resolved" by the courts until the appellate process has been completed. Accordingly, based upon the plain language of Paragraphs 67 and 113 of the Consent Decree, the Court should conclude that Akron's obligation to perform the action "necessarily affected" by the proposed modification (*i.e.*, the construction of the EHRT facility) "shall be stayed" until the appellate process has been completed and the "dispute" has been "resolved." (*Id.*)

### C. The Court Should Grant A Stay Based Upon A Balancing Of The Relevant Stay/Injunction Factors.

Even if Paragraph 67 of the Consent Decree does not apply, the fact remains that the Court nevertheless should grant a stay of the EHRT requirement based upon a balancing of the four (4) factors that ordinarily apply to a stay or injunction pending appeal. As discussed below, all four factors weigh strongly in favor of a stay.

### 1. Akron Is Likely To Prevail On The Merits.

The first factor weighs strongly in favor of a stay because, as previously discussed, Akron's appeal presents a number of significant legal issues that are subject to *de novo* review and should be decided on the merits before Akron should be forced to construct a $209 million facility that is not cost-effective or appropriate

under the CWA and the CSO Policy.  Indeed, for the reasons set forth below, Akron is likely to prevail on the merits of all of these legal issues presented in this appeal.

> **a.    The District Court Violated Supreme Court Precedent By Imposing A Legal Standard That Exceeds The Legal Standards In The CWA and CSO Policy.**

The Supreme Court has established a two-pronged analysis for deciding whether to modify a consent decree under Fed. R. Civ. P. 60(b)(5).  *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992).  Under the first prong, the moving party "bears the burden of establishing that a significant change in circumstances warrants revision of the decree."  *Id.* at 383-384.  This burden can be met by demonstrating "a significant change in factual conditions or in law." *Id.* at 384.  Thereafter, "[o]nce a moving party has met its burden of establishing either a change in fact or in law warranting modification of a consent decree, the district court should determine whether the proposed modification is suitably tailored to the changed circumstance." *Id*. at 391.

Importantly, the Supreme Court has emphasized that this two-prong analysis is a "flexible" standard that should focus on *existing* conditions, and should not be denied merely because it seeks to change the original agreement between the parties.  In particular, the Court stated that "[Rule 60(b)(5)], in providing that, on such terms as are just, a party may be relieved from a final judgment or decree where it is no longer equitable that the judgment have prospective application, permits a less stringent, more

flexible standard." *Rufo*, 502 U.S. at 380. Thus, "[a] court determining whether to vacate or modify a decree should respond to the specific set of circumstances before it by considering factors unique to the conditions of the case." *Id*.

Here, Akron presented evidence to show that there has been a substantial change in circumstances since the LTCP Update was adopted in 2011 and the Consent Decree approved in 2014. When Akron originally agreed to construct the EHRT facility in 2011, it was projected that there would be 7 overflows per year from the OCIT, which was a number that was substantially *higher* than the 4 sewer overflows permitted by the presumption method in the CSO Policy. Moreover, the estimated cost of the EHRT facility in 2011 was only $56 million. Thus, under the cost-effective analysis mandated by the CSO Policy, it was reasonable and appropriate for Akron to agree to construct an EHRT facility in order to address the violation presented by the fact that there would be 7 overflows in a typical year.

Now, however, the circumstances have substantially <u>changed</u>. Over 13 years after the LTCP Update in 2011, it is now projected that there will be only three (3) sewer overflow events in a typical year, and only two overflow events during the recreation season. This is substantially *lower* than the number of overflows permitted by the presumption approach in the CSO Policy, and *less* than the number of overflows permitted in most other major cities in Ohio. (Doc.#371-3, Gsellman Decl. ¶ 40, PageID#39923); (Doc.#373-3, Brumbaugh Decl. ¶ 15-16, PageID#40143).

Moreover, since 2011, the estimated cost of the EHRT facility has substantially increased – from $56 million to $209 million. (Doc.#371-3, Gsellman Decl. ¶ 29-30, PageID#39920-39921). Thus, based upon the cost-effective performance curve mandated by the CSO Policy – which the United States has not challenged – it is no longer reasonable or appropriate under the circumstances to spend $209 million on an EHRT facility merely to treat three potential overflows that, even if untreated, still would satisfy Ohio's water quality standards. (Id. at ¶ 31); (Doc.#373-2, Ward Decl. ¶ 7, PageID#40133-40134).

Notwithstanding this substantial change in circumstances, however, the District Court ignored the cost-effective requirement in the CSO Policy, and instead determined that Akron should be required to comply with "its own prior agreement to achieve *more than the minimum*" and, regardless of the cost, should be required to construct a $209 million facility to treat *any* outflows from the OCIT unless it can show that there would be "zero" projected overflows. (Doc.#390, Order, pp. 6-8, PageID#41333-41335). This ruling violates the Supreme Court's precedent in *Rufo* and *Horne* because it wrongfully imposes a higher legal standard upon Akron that *significantly exceeds* the standards imposed by the CWA and the CSO Policy.

As the Supreme Court held in *Horne*, the federal courts "must remain attentive to the fact that 'federal-court decrees *exceed* appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such

24

a violation.'" *Id.* at 450 (emphasis added) (citations omitted). Thus, while the original 2011 agreement to construct an EHRT facility may have been necessary in 2014 to redress and prevent the environmental violations that were anticipated when the Consent Decree was originally approved, it is *no longer* necessary or cost-effective under the CWA and the CSO Policy, which, as previously discussed, does not require zero outflows, but <u>mandates</u> the adoption of cost-effective controls and *permits* 4-6 sewer overflows in a typical year under the presumption approach. By mandating that Akron must construct an EHRT facility merely because Akron agreed to construct an EHRT facility in the original Consent Decree when seven (7) outflows were projected, therefore, the District Court has violated Supreme Court precedent, which prohibits the federal courts from using consent decrees to impose financial obligations upon defendants that *exceed* the requirements of federal law. *Horne*, 557 U.S. at 449-450.

> **b.    The District Court Misconstrued And Misapplied The CSO Policy And Ohio's Water Quality Standards.**

The district court also erred as a matter of law in how it interpreted and applied the CWA and the CSO Policy. As previously discussed, Section 402(q) of the CWA <u>mandates</u> that the Consent Decree must conform to the CSO Policy. Thus, the key legal issue presented by Akron's Motion is whether the imposition of the EHRT remedy still conforms to the CSO Policy in light of the substantial change in conditions that have arisen since the original Consent Decree.

In this regard, the key facts relating to the change in circumstances are undisputed. It is undisputed that the original model that was used in developing the 2011 LTCP Update predicted that there would be seven overflow activations from the OCIT, and that additional control measures at the OCIT would be necessary to comply with the CSO Policy based upon the conditions that were known in 2011. (Doc.#371-3, Gsellman Decl. ¶ 23, PageID#39919); (Doc.#373-2, Ward Decl. ¶ 4, PageID#40133). However, the updated and recalibrated model, which is more accurate than the original model and now includes all of the control measures implemented to date, demonstrates there are now only three projected overflow activations at the OCIT, and upon completion of NSIT, Akron will have eliminated or captured for full treatment 99% of all wet weather flow to the system. (Doc.#371-3, Gsellman Decl. ¶ 28, PageID39920); (Doc.#373-2, Ward Decl. ¶ 5-6, PageID#40133). Thus, under both the presumption and demonstration approaches, the number and volume of outflows would be in conformance with the CSO Policy. (Doc.#373-3, Brumbaugh Decl. ¶ 8-17, PageID#40141-40144).

In proceedings below, the United States submitted a Declaration from one of its environmental consultants, Mark J. Klingenstein, who argued that Akron still should be required to construct the EHRT because "the E.coli levels upstream of Akron are currently in non-attainment with recreational water quality standards" adopted by the Ohio EPA, and that allowing "three untreated discharge events" in a

typical year "would *worsen* the extent of nonattainment by increasing the E. coli levels downstream of the discharge, including the portion of the Cuyahoga River flowing into the Cuyahoga Valley National Park."  (Doc.#374-1, Klingstein Decl. ¶ 12 and ¶ 17-21, PageID#40191-40193) (emphasis added).  This argument was then adopted by the District Court who repeatedly made the point that Akron should not be permitted to "dump millions of gallons of untreated sewage into the CVNP." (Doc.#390, Order, dated March 1, 2024, PageID#41328).  Thus, the District Court found that, unless there were *zero* overflows, Akron must still construct the EHRT.

This is <u>legal</u> error subject to *de novo* review because it misconstrues the CSO Policy and Ohio's water quality standards.  As previously discussed, the CSO Policy and Ohio's water quality standards do not require *zero* overflows.  Indeed, even though the Cuyahoga River does not currently satisfy Ohio's WQS attainment standards, it is undisputed that 99.75% of the E.coli bacteria in the Cuyahoga River comes from *other* sources.  Thus, under Ohio's water quality standards, the question is <u>not</u> whether Akron's sewer outflows would "worsen" the E.coli levels in the Cuyahoga River.  Rather, since 99.75% of E.coli bacteria levels comes from other sources, Akron's compliance with Ohio's water quality standards must be determined based upon whether Akron has exceeded the "total maximum daily load" used to apportion pollutant loads. (Doc.#373-2, Brumbaugh Decl. ¶ 11-12, PageID#40135).

This argument is not based upon a difference of opinion between environmental experts. Rather, it is based upon the plain language of the CSO Policy, which provides that "[w]here WQS and designated uses are not met in part because of natural background conditions *or pollution sources other than the CSOs*, a total maximum daily load including a wasteload allocation and load allocation or other means should be used to apportion pollutant loads." (*Id.*, citing Section II.C.4.b of the CSO Policy, 59 Fed. Reg. at 18693). Here, as previously discussed, Ohio EPA – the agency that adopted Ohio's water quality standards – has determined that Akron "has significantly reduced its bacteria loading to the river and will be within 0.8% of its allocated wasteload for bacteria under the Total Maximum Daily Load (TMDL) for the Lower Cuyahoga River." (Doc.#373-3, Brumbaugh Decl. ¶ 17, PageID#40144). The United States presented no evidence to dispute this TMDL calculation. Accordingly, the Ohio EPA has determined that it would not be "technically effective or cost-effective" to construct an EHRT facility merely to address this "de minimis" amount. (*Id.*)

In its Order, the District Court did not address Akron's compliance with the TMDL allocation at all, and ignored the portions of the CSO Policy that require "cost-effective" control measures. This is also legal error subject to *de novo* review. Here, Akron presented undisputed evidence to show Akron's substantial compliance with Ohio's TMDL allocations for the Cuyahoga River, and that it is no longer cost-effective to require Akron to construct a $209 million facility to treat the

substantially diminished number of overflows from the OCIT. (Doc.#371-3, Gsellman Decl. ¶¶ 30-31, Ex. 3, PageID#39221, PageID#40015); (Doc. #372-3, Brumbaugh Decl. ¶¶ 15-17, PageID#40143-40144). The United States did not present any evidence to dispute the Ohio EPA's TMDL calculations or Akron's cost performance curve analysis. Thus, Akron is likely to prevail on its argument that the District Court misconstrued and misapplied the CSO Policy and Ohio's water quality standards.

In this regard, the District Court also misconstrued Akron's argument about the financial burdens imposed by the 2014 Consent Decree. While Akron certainly believes that the construction of an EHRT facility will be significantly more burdensome and financially onerous than it originally anticipated, the primary argument raised by Akron is that construction of the EHRT facility at a $209 million price tag is no longer a "cost-effective" remedy under the CSO Policy. This is again legal error because the Supreme Court explained in *Horne* that consent decrees should not be used to impose financial burdens upon state and local governments unless they are expressly required by federal law. *Id.,* 557 U.S. at 448-450. Indeed, where, as here, "state and local officials . . . inherit overbroad and outdated consent decrees that limit their ability to respond to the priorities and concerns of their constituents," the Supreme Court has held that such consent decrees wrongfully constrain the ability of state and local officials "to fulfill their duties as

29

democratically-elected officials." *Id.* at 449. Accordingly, for this additional reason, Akron is likely to prevail on its argument that the District Court erred as a matter of law by misconstruing and misapplying the CSO Policy and the legal standards adopted by the Supreme Court in *Rufo* and *Horne*.

        **c.**       **The District Court Misconstrued The Consent Decree.**

Akron also is likely to prevail on its argument that the District Court misconstrued the Consent Decree in denying Akron's Motion. In its Order, the District Court cited the force majeure clause in Paragraph 56 of the Consent Decree to support the conclusion that the three-fold increase in the cost of the EHRT facility did not justify a modification. (Doc.#390, Order, pg. 10, PageID#41337). This is legal error that misconstrues the Consent Decree and the applicable case law. Akron is not arguing that it cannot construct the EHRT facility because it is financially unable to perform this obligation. Rather, it is arguing that the EHRT is no longer a *cost-effective* control measure, as defined by the CSO Policy. Thus, the issue presented is not merely financial burden; but whether enforcement of the EHRT remedy conforms with the requirements of the CWA and the CSO Policy.

Indeed, by suggesting that the force majeure clause precluded Akron from modifying the Consent Decree, the District Court ignored the fact that Section XXIV of the Consent Decree specifically recognizes that Akron can seek a modification under Fed. R. Civ. P. 60(b)(5) based upon a change in circumstances, and as the U.S.

Supreme Court had held, "[f]inancial constraints … are a legitimate concern … and therefore are appropriately considered in tailoring a consent decree modification" under Rule 60(b)(5). *Rufo*, 502 U.S. at 392-93. Thus, the District Court misconstrued both the Consent Decree and the Supreme Court's opinion in *Rufo* by ruling that the force majeure clause precluded Akron from obtaining a modification.

Finally, the district court also misconstrues the Consent Decree and the Supreme Court's decision *Rufo* by finding that Akron's cost increase was foreseeable and should have been anticipated. (Doc.#390, Order, pg. 10, PageID#41337). While the district court ruled that "Akron has not offered any information about normal inflation in the industry to explain what the cost would be by virtue of nothing beyond the passage of time," this ruling ignores the undisputed fact that Akron provided detailed financial information to explain that the updated cost estimate of $209 million "was <u>not</u> an inflationary escalation of the original estimated costs, but an entirely new cost estimate based upon present equipment costs and construction costs using updated facts and data." (Doc.#371-3, Gsellman Decl. ¶ 30, PageID#39921). This evidence, in fact, was corroborated by the government's expert who determined that inflation resulted in the original cost estimate increasing from $57.58 million in 2011 dollars to $77.55 million in 2022 dollars. (Doc.#374-2, Coad Decl. ¶ 5, PageID#40260). Thus, the undisputed evidence in the record demonstrates that the increased cost of the EHRT facility is

significantly _**more**_ than the mere cost of inflation.  Accordingly, for this additional reason, Akron is likely to prevail on the merits of its appeal.

### 2.    Akron Will Suffer Irreparable Harm Absent A Stay.

A stay also should be granted because Akron will suffer irreparable harm. While a financial injury, standing alone, ordinarily does not satisfy the irreparable harm standard if damages can be recovered at a later date, Akron's injury is irreparable because it will not be able to recover damages from the United States if it is forced to construct the $209 million EHRT facility.  This is the definition of irreparable harm.  *See Ohio v. Becerra*, 87 F.4th 759, 782-783 (6th Cir. 2023) (finding that State of Ohio would incur irreparable harm because "economic injuries caused by federal agency action are generally unrecoverable").

The irreparable harm in this case, however, is more than a financial injury. Here, if the requirement to build the EHRT is not stayed, Akron will need to move forward immediately with this project and begin the process of designing, bidding, and constructing the EHRT in order to meet the Consent Decree's deadlines. (Doc.#392-2, Ludle Decl. ¶ 6, PageID#41366).  Paragraph 11.a imposes a deadline of April 30, 2024, for the bidding of the Project, and requires that Akron complete construction and begin operations of the EHRT facility by October 31, 2027.  While the 2027 deadline is over three years from now, the Project is massive, and must be commenced as soon as possible if Akron is going to meet that deadline.  (*Id* at ¶ 6)*.

Moreover, because there is a long lead time to manufacture the required equipment, contracts will need to be entered into with the treatment equipment manufacturers, and loan documents will need to be signed.  (*Id*. at ¶ 7-9).  Thus, absent a stay, Akron's right to an appeal will essentially be eliminated if it is forced to build this $209 million facility.

In this regard, it is important to emphasize that Akron will become exposed to liability for millions of dollars in stipulated penalties if it fails to comply with the Consent Decree's deadlines.  (Doc.#155, Consent Decree, ¶ 35, PageID#7238).  Thus, without a stay, the only way for Akron to avoid suffering the substantial harm of building the ERHT during an appeal is to pursue its right to an appeal without implementing the EHRT project.  Akron will then risk potential liability, however, for millions of dollars if Akron loses the appeal, which again essentially eliminates Akron's right to an appeal.  Finally, without a stay, Akron will also need to raise sewer rates to pay for the EHRT.  (Doc.#392-2, Ludle Decl. ¶ 11, PageID#41368).  Even if Akron is successful on appeal, Akron will not be able to refund a significant portion of the fees paid by sewer customers as a result of the EHRT rate increase.  (*Id*. at ¶ 12).  Accordingly, the Court should conclude that the second factor weighs in favor of a stay.

### 3.    A Stay Will Not Substantially Injure Any Third Parties.

The third factor also weighs in favor of a stay.  While the district court found that it would cause harm to third parties if the EHRT was not built, this ruling ignores the fact that over 99.75% of the bacteria loading to the Cuyahoga River is due to sources upstream from Akron, and that Akron's contribution is less than 0.08% of the total load.  (Doc. #373-3, Brumbaugh Decl. ¶ 7, PageID#40144).  Indeed, the original 2011 LTCP Update already envisioned that Akron would not be required to put the EHRT into operation until October 31, 2027, and thus, the Parties agreed that Akron would be able to continue to operate its sewer system for over 16 years without an EHRT.   Under the circumstances, therefore, it would not cause substantial harm to third parties if implementation of the EHRT requirement were delayed for an additional 6-12 months until after this appeal can be decided.

Finally, the lack of harm to third parties is further demonstrated by the actual operations of the OCIT.  Akron's current model predicts that the OCIT will overflow no more than 3 times in the Typical Year.  However, actual operations over the past 2 years have *outperformed* the model. (Doc.#392-3, Declaration of Robert Scarlatelli, ¶¶7-14).  Indeed, at the time when Akron originally filed its Motion in September 2023, the OCIT had only experienced two overflow events in the prior 557 days.  (Doc.#371-3, Gsellman Decl. ¶ 27, PageID#39920).  And, as of April 1, 2024, the OCIT has only experienced two overflow events in the prior <u>755</u> days.

(Doc.#392-3, Scarlatelli Decl. ¶ 12, PageID#41371).  Accordingly, for all of these reasons, the Court should conclude that the third factor weighs in favor of a stay.

### 4.    The Public Interest Favors A Stay.

Finally, the Court also should conclude that the fourth factor weighs in favor of a stay.  Here, the public interest is advanced by ensuring that Akron and its taxpayers are not required to pay for a $209 million facility that is no longer cost-effective or appropriate under the CSO Policy.  Indeed, in adopting the Clean Water Act, Congress has mandated each Consent Decree must conform to the US EPA's 1994 CSO Policy, which, in turn, mandates that sewer overflow controls must be "cost-effective."  Thus, it would advance the public interest to stay the implementation of the EHRT requirement until this Court can decide the important legal question of whether the EHRT requirement no longer conforms to the CSO Policy.

## II.    THE COURT SHOULD NOT REQUIRE AKRON TO POST A BOND AS A CONDITION FOR GRANTING A STAY.

When granting a stay under Fed. R. Civ. P. 8(a), this Court has discretion over whether to require a bond to secure the opposing party's rights.  In this case, since the EHRT requirement in the Consent Decree is not a monetary award, a bond is not necessary to secure the rights of the United States.  Indeed, the United States already agreed in the Consent Decree that the compliance deadlines would be stayed pending judicial review of a disputed issue, and there is no requirement that Akron post a bond pending the completion of this judicial review.  (Doc.#155, Consent Decree ¶

67, PageID#7252).  If a stay were granted, therefore, the United States would not incur any financial harm because the requirement to build the EHRT would be preserved if the United States is successful on appeal.  Accordingly, the Court should exercise its discretion by granting a stay without imposing a bond.

## **CONCLUSION**

For all of these reasons, Akron respectfully requests that the Court issue an Order staying the obligation to design and construct a EHRT facility pending the resolution of the dispute that is the subject of Akron's appeal.

Dated: April 30, 2024                      Respectfully submitted,

 */s/  Stephen W. Funk*             _
Stephen W. Funk (0058506)
Terrence S. Finn (0039391)
Roetzel & Andress, LPA
222 South Main Street
Akron, OH  44308
Telephone: 330.376.2700
Email:  sfunk@ralaw.com

*Attorneys for Defendant-Appellant*
*City of Akron, Ohio*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Motion for Stay Pending Appeal and Brief in Support comply with the type-volume limitations, typeface requirements, and type style requirements of the Federal Rules of Appellate Procedure in the following manner:

1.      The foregoing Motion and Brief comply with the type-volume limitation of 9,000 words requested by Akron's Unopposed Motion for Leave to Exceed the Word Limitation filed on April 24, 2024.   In particular, the Motion contains 223 words, and the Brief contains 8,691 words, excluding the caption, signature blocks, table of contents, table of authorities, certificate of compliance, and certificate of service.  This word count was determined based upon the calculation performed by Microsoft Word computer software used in drafting the Motion and Brief, as permitted by the Federal Rules of Appellate Procedure.

2.      The foregoing Motion and Brief also comply with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times Roman type style.


*/s/ Stephen W. Funk*
Stephen W. Funk

## **PROOF OF SERVICE**

I hereby certify that on April 30, 2024, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all Parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.


/s/  Stephen W. Funk
Stephen W. Funk