# CASE NO. 24-3277

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

CITY OF AKRON, OHIO,

Defendant-Appellant,

and

THE STATE OF OHIO,

Defendant-Appellee

On Appeal from the United States District Court for the
Northern District of Ohio, Case No. 5:09-CV-0272

### *AMICUS CURIAE* BRIEF OF ASSOCIATION OF OHIO METROPOLITAN WASTEWATER AGENCIES IN SUPPORT OF APPELLANT CITY OF AKRON AND REVERSAL OF DISTRICT COURT'S DECISION

D. Rees Alexander (0090675)
Katherine E. Wenner (0100911)
SQUIRE PATTON BOGGS (US) LLP
41 South High Street, 20th Floor
Columbus, OH 43215
Telephone: (614) 365-2700
rees.alexander@squirepb.com
katherine.wenner@squirepb.com

*Attorneys for Association of Ohio Metropolitan Wastewater Agencies*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i
TABLE OF AUTHORITIES ....................................................................................... ii
STATEMENT OF *AMICUS CURIAE* INTEREST .................................................. 1
INTRODUCTION ........................................................................................................ 2
BACKGROUND .......................................................................................................... 3
ARGUMENT ................................................................................................................ 5
  I.   Federal law provides flexibility for consent decrees when circumstances change dramatically. ................................................................................... 5
  II.   The CSO Policy requires consideration of cost effectiveness. .................... 7
    A.   The District Court ignored the fact that the EHRT is not cost effective. . 8
    B.   The need to weigh cost effectiveness is heightened due to the critical infrastructure needs facing communities. ........................................... 10
    C.   The District Court's decision would set harmful precedent that conflicts with the CSO Policy ........................................................................... 12
CONCLUSION .......................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Rufo v. Inmates of Suffolk Cnty. Jail*,
   502 U.S. 367 (1992)......................................................................................6

**Statutes**

33 U.S.C. § 1342(q) ........................................................................................12

**Other Authorities**

Am. Soc'y of Civ. Eng'rs, 2021 Report Card for Ohio's Infrastructure 127, 129 (2021), https://infrastructurereportcard.org/wp-content/uploads/2016/10/FullReport-OH_2021_smaller-1.pdf...........................10

Combined Sewer Overflow (CSO) Control Policy, 59 Fed. Reg. 18688 (Apr. 19, 1994)..................................................................................7, 13

Fed. R. App. P. 29................................................................................................1, 3

Fed. R. Civ. P. 60 ..........................................................................................2, 4, 5, 6

In the Public Interest, Restoring and Reimagining Investment in Public Water 1 (Feb. 2021) ........................................................................10

Ohio EPA, *Combined Sewer Overflow Control Program* (last visited July 1, 2024), https://epa.ohio.gov/divisions-and-offices/surface-water/permitting/combined-sewer-overflow-control-program............................4

United States Census Bureau, *Poverty, All People in Akron City, Ohio* (last visited July 2, 2024), https://data.census.gov/all?q=poverty%20in%20akron,%20ohio. ......................11

## STATEMENT OF *AMICUS CURIAE* INTEREST

*Amicus curiae* Association of Ohio Metropolitan Wastewater Agencies ("AOMWA") is a not-for-profit trade association that represents the interests of public wastewater agencies across the state of Ohio and serves more than 4 million Ohioans, successfully treating more than 320 billion gallons of wastewater per year. AOMWA's members have a direct interest in this matter because the City of Akron's motion to modify its 2014 Consent Decree ("Consent Decree") pertains to combined sewer overflows ("CSOs") and many of AOMWA's members' systems include CSOs, most of which operate under a federal consent decree. The Sixth Circuit's resolution of this matter will have direct impact on AOMWA's members.

Pursuant to Fed. R. App. P. 29(a)(4)(E), AOMWA states that the City of Akron is a member of AOMWA. A portion of members' annual dues has been designated to fund the costs of preparing and submitting this brief, and therefore, a portion of the City of Akron's dues also funded these costs. However, no Party contributed funds intended to fund the preparation or submission of this brief.

1

## INTRODUCTION

The District Court addressed two potential outcomes: First, the Court could have accepted the City of Akron's approach to fund alternative projects that currently lack funding, resulting in greater environmental benefits at less cost. Second, the Court could have required the City of Akron to follow the 2014 Consent Decree requirement to construct a specific type of facility, even though (1) the costs for such a project had nearly quadrupled in the intervening years, (2) the facility is not required by the Clean Water Act ("CWA") because the performance of the City's system has improved, (3) the facility would not address the vast majority of bacteria sources in the Cuyahoga River, and (4) construction of the facility will lead to a worse environmental outcome compared with Akron's proposed alternatives. Fortunately, the CWA allows for modifications based on practical changes in circumstances.

The Court should reverse and remand the District Court's decision. Rule 60(b)(5) provides flexibility to address changed circumstances with respect to CSO consent decree modifications, and this was disregarded by the District Court, which repeatedly referred to the terms of the original agreement. Additionally, the CSO Policy requires consideration of cost effectiveness, and the Consent Decree's requirement for an enhanced high-rate treatment facility ("EHRT") is neither cost effective nor in the public's best interests. Moreover, it will provide *less*

environmental benefit than the City of Akron's proposed alternatives. Ohio utilities are already experiencing significant infrastructure demands for projects designed to meet environmental needs throughout communities, and requiring the City to construct this EHRT in conflict with the CSO Policy will set a harmful precedent for future project requirements that provide less environmental benefit while diverting funds from other significant infrastructure needs. For the reasons stated herein, AOMWA supports the City of Akron's request that the Court reverse and remand the District Court's Order of March 1, 2024. Pursuant to Fed. R. App. P. 29(a)(1), all parties have consented to the filing of this brief.

## BACKGROUND

AOMWA is a not-for-profit trade association that represents the interests of public wastewater agencies across the state of Ohio, and AOMWA's members include the cities of Akron, Avon Lake, Bowling Green, Canton, Columbus, Dayton, Euclid, Fairfield, Hamilton, Lancaster, Lima, Lorain, Middletown, Newark, Port Clinton, Salem, Solon, Springfield, Wadsworth, and Warren. AOMWA's members also include Butler County, Greene County, Hamilton County, Montgomery County, the Summit County Metropolitan Sewer District, the Metropolitan Sewer District of Greater Cincinnati, the Northeast Ohio Regional Sewer District, and the Tri-Cities Regional Wastewater Authority. AOMWA serves more than 4 million Ohioans and successfully treats more than 320 billion gallons of wastewater each year. Ohio has

3

approximately 1,007 permitted CSOs in 66 communities,[1] and AOMWA's membership contains 13 of those CSO communities. Nearly half of AOMWA's member utilities are CSO communities. AOMWA supports the City of Akron's motion to modify its 2014 Consent Decree under Fed. R. Civ. P. 60(b)(5) to eliminate the requirement to design and construct a $209 million EHRT. The EHRT is no longer needed to ensure that the City of Akron's sewer system complies with the CWA and U.S. EPA's CSO Policy.

The City of Akron originally agreed to construct an EHRT facility in 2011 because it was projected at that time that the City of Akron's sewer system would have seven overflow events per year, and it was projected to only cost $56 million to construct the EHRT facility to treat the anticipated number of overflows. (Doc.#373-3, Brumbaugh Decl. ¶ 15, PageID#40143). However, in the over 12 years since then, circumstances have changed such that the City of Akron is now controlling 99% of its wet weather flow and experiences only 3 overflow events per year. (Doc.#371-3, Gsellman Decl. ¶ 27-28, PageID#39920). Further, the cost to construct the EHRT facility has skyrocketed to almost 373% of the original anticipated cost. Ohio EPA, the permitting authority, has already determined that the City of Akron will provide an adequate level of control to comply with the water quality standards for the

---

[1] Ohio EPA, *Combined Sewer Overflow Control Program* (last visited July 1, 2024), https://epa.ohio.gov/divisions-and-offices/surface-water/permitting/combined-sewer-overflow-control-program.

Cuyahoga River without the EHRT. (Doc.#373-2, Ward Decl. ¶ 8-12, PageID#40134-36).

The City of Akron's proposed modification provides that, in lieu of constructing the $209 million EHRT, it could more effectively protect the environment through targeted measures to reduce the amount of daily bacteria currently discharging into the Cuyahoga River with measures costing only a small fraction of the EHRT. (Doc.#371-5, Collins Decl. ¶ 12-20, Ex. 1, PageID#40063-73); (Doc.#373-2, Ward Decl. ¶ 13-18, PageID#40136-37). The City of Akron's proposed alternative projects align with the CSO Policy in that they provide a cost-effective remedy with greater environmental benefits for the community.

## ARGUMENT

The City of Akron's proposed modifications to the Consent Decree should be approved because (1) federal law appropriately provides a degree of flexibility when circumstances change significantly; (2) the EHRT facility is no longer cost effective; and (3) requiring its construction would set a harmful precedent for other communities and take away needed funding from other infrastructure needs.

### I. Federal law provides flexibility for consent decrees when circumstances change dramatically.

Rule 60(b)(5) provides that the court may modify a consent judgment whenever "it is no longer equitable that the judgment should have prospective application." Fed. R. Civ. P. 60(b)(5). The Supreme Court has established that, in

analyzing whether to modify a consent decree under Rule 60(b)(5), the moving party "bears the burden of establishing that a significant change in circumstances warrants revision of the decree," which can be met by demonstrating "a significant change in factual conditions or in law." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383-84 (1992). "Once a moving party has met its burden of establishing either a change in fact or in law warranting modification of a consent decree, the district court should determine whether the proposed modification is suitably tailored to the changed circumstance." *Id*. at 391. This analysis is a "flexible" standard that should focus on *existing* conditions and should not be denied merely because it seeks to change the original agreement between the parties. *See id.* at 380.

It is vital that District Courts and U.S. EPA retain flexibility and evaluate changing circumstances with respect to water quality, costs, and other practical considerations. Wastewater utilities such as the City of Akron and AOMWA's members serve a critical function to the community in treating wastewater and protecting the environment but cannot adequately maintain this role if evolving costs and other practical considerations are not considered.

The District Court failed to follow *Rufo*'s call for flexibility to address changed circumstances when it refused to modify the City of Akron's Consent Decree and instead focused on what Akron "voluntarily agreed to construct" and Akron's agreement to "zero overflows in a typical year." (Doc. #390 at 7-8). The District Court

sidestepped the fact that Akron's current performance complies with the CSO Policy, conceding that it would not have approved a consent decree that is anticipated to lead to any overflows. *Id*. at 9, n.3. Accordingly, the District Court held that Akron "cannot achieve" any modification that results in any overflows, as Akron "could not have achieved [this result] through litigating the matter." *Id*. at 9. This reasoning does not comport with *Rufo*'s dynamic approach, and replaces an evaluation of changed circumstances with an evaluation of the original agreement. The Court should reverse and remand.

## II. The CSO Policy requires consideration of cost effectiveness.

U.S. EPA and the District Court have ignored the CSO Policy's requirement to consider cost effectiveness. U.S. EPA's CSO Policy is "a comprehensive national strategy" designed to "achieve cost effective CSO controls that ultimately meet appropriate health and environmental objectives." Combined Sewer Overflow (CSO) Control Policy, 59 Fed. Reg. 18688, 18688 (Apr. 19, 1994). "EPA recognizes that financial considerations are a major factor affecting the implementation of CSO controls. For that reason, this Policy allows consideration of a permittee's financial capability in connection with the long-term CSO control planning effort." *Id*. at 18690. The CSO Policy contains four key principles that help "ensure that CSO controls are cost-effective and meet the objectives of the CWA," including providing sufficient flexibility to municipalities to consider the specific needs of the site and

7

"to determine the most cost-effective means of reducing pollutants and meeting CWA objectives and requirements." *Id.* at 18689.

Additionally, the analysis of alternative controls helps provide a reasonable assessment of cost and environmental performance. *Id.* at 18693. This analysis involves comparing the costs and the expected performance (in terms of pollutant reduction and frequency of overflow events) of different control measures. The permittee should use this analysis "to determine where the increment of pollution reduction achieved in the receiving water diminishes compared to the increased costs. This analysis … should be among the considerations used to help guide selection of controls." *Id.* The CSO Policy places substantial emphasis on cost effectiveness to ensure that CSOs can meet the requirements of the CWA while ensuring public resources are utilized efficiently.

### A. The District Court ignored the fact that the EHRT is not cost effective.

The Court should reverse and remand because the CSO Policy requires consideration of cost effectiveness, and the EHRT is not cost effective. When the EHRT was originally planned, it was estimated that there would be seven overflow events per year and the facility would cost $56 million. (Doc.#373-3, Brumbaugh Decl., Ohio EPA, ¶ 15, PageID#40143). The cost of the EHRT has increased by over $153 million since it was originally agreed upon. (Doc.#371-3, Gsellman Decl. ¶ 29-30, PageID#39920-21); (Doc.#373-2, Ward Decl. ¶ 4-5, PageID#40133). This

8

is an increase by more than 373%. Even after accounting for inflation, the United States' financial expert has determined that the cost of the EHRT has increased by over $131 million in real dollars since it was originally agreed to by the parties in 2011. (Doc.#374-2, Coad Decl. ¶ 5, PageID#40259-60); *see also* (Doc.#371-3, Gsellman Decl. ¶ 30, PageID#39921).

The EHRT is not cost effective or in the public's best interests. The City of Akron is already anticipating that the required EHRT will impact utility customers through increased rates. (Doc.#373-3, Brumbaugh Decl. ¶ 7, PageID#40140-41). Further, Summit County Metropolitan Sewer District ("SCMSD"), as a tributary customer to the City of Akron, has also identified that a portion of the EHRT cost will necessarily be passed down to it, which would place extreme rate pressure on SCMSD, even though it already implemented a significant 5-year rate increase in 2020. It is not in the public interest to require ratepayers to pay for a $209 million facility when the existing facility already complies with the CWA and the CSO Policy. *See* (Doc.#373-1, Ohio Mem. in Support, pg. 10, PageID#40123); (Doc.#373-2, Ward Decl., Ohio EPA Asst. Section Chief, Division of Surface Water, ¶ 7-12, PageID#40133-36). Meanwhile, the City of Akron's proposed modifications would provide greater environmental benefit for a mere $30 million, or approximately 14% of the EHRT costs. The difference in these figures highlights the importance of

the CSO Policy's cost considerations, and the District Court erred in declining to approve modification of the Consent Decree.

### B. The need to weigh cost effectiveness is heightened due to the critical infrastructure needs facing communities.

Cost effectiveness is an especially important consideration given significant infrastructure needs facing communities throughout the country. Overall federal funding for clean drinking water systems has shrunk dramatically, from 63 percent of capital improvements in 1977 to just 9 percent of capital improvements 40 years later.[2] As of 2019, annual rates for a typical customer had increased by almost 70% in 10 years.[3] And, based on a survey from 2016, a report published in 2021 identifies that Ohio's wastewater authorities would need almost $17 billion to meet water quality and public health goals of the CWA.[4] Infrastructure needs have continued to escalate, and Ohio's utilities are already facing difficulty attaining the necessary funding to meet unprecedented critical infrastructure needs.

Requiring communities such as the City of Akron to fund such expensive endeavors as the EHRT when they are not environmentally beneficial will shift necessary funding away from other critical infrastructure projects. Over the past 12

---

[2] IN THE PUBLIC INTEREST, RESTORING AND REIMAGINING INVESTMENT IN PUBLIC WATER 1 (Feb. 2021).
[3] AM. SOC'Y OF CIV. ENG'RS, 2021 REPORT CARD FOR OHIO'S INFRASTRUCTURE 127 (2021), https://infrastructurereportcard.org/wp-content/uploads/2016/10/FullReport-OH_2021_smaller-1.pdf.
[4] *Id.* at 129.

10

years, the City of Akron has already invested over $740 million in new investments into its sanitary sewer system, and upon completion of its North Interceptor Tunnel, will have invested over $1 billion in the improvement of its sanitary sewer system. (Doc.#371-3, Gsellman Decl. ¶ 18-21, PageID#39918-19). Akron anticipates that the EHRT would require a rate increase for its customers, (Doc.#373-3, Brumbaugh Decl. ¶ 7, PageID#40140-41), 24.4% of which already live in poverty.[5] Yet, EPA still seeks to require Akron to construct an additional $209 million EHRT even though alternatives could provide greater environmental benefit for just $30 million.

As other examples of the critical infrastructure needs facing Ohio utilities, in 2023, the City of Dayton faced capital costs for water and sewer programs at a level higher than the total capital needs of both programs *for the past 25 years combined*. The City of Dayton had needs that exceeded $140 million for 2023 alone. The Northeast Ohio Sewer District ("NEORSD") faces $2.2 billion in wastewater needs and $1.1 billion in stormwater needs through 2042, and this does not include the additional $3.4 billion in local sanitary sewer infrastructure needs throughout the NEORSD service area. Tri-Cities Regional Wastewater Authority currently has a budget of $144 million for two mandated capital improvement projects that will address elimination of collection system sanitary sewer overflows, a new future 2027

---

[5] United States Census Bureau, *Poverty, All People in Akron City, Ohio* (last visited July 2, 2024), https://data.census.gov/all?q=poverty%20in%20akron,%20ohio.

11

phosphorus limit, and stricter ammonia and BOD effluent limits. Hamilton County, which has already spent more than $1.8 billion on its phased Consent Decree, faces a currently estimated additional cost of $6.7 billion, with at least $1.82 billion to be spent over the next ten years alone. The Summit County Metropolitan Sewer District's 5-year Capital Improvement Plan calls for expenditures totaling $209 million to maintain existing infrastructure, and due to lack of sufficient Federal or State grant funding, 95% of capital improvement funding is through state revolving loan funds only.

These costs represent a narrow snapshot of the infrastructure funding needs for environmentally *beneficial* projects for wastewater and stormwater management alone, to say nothing about other projects designed to protect health and the environment. Meanwhile, U.S. EPA seeks to require the City of Akron to spend $209 million on a project that will provide only at most *de minimis* water quality benefit. This approach would deplete finite funding that could have been invested in beneficial projects.

### C. The District Court's decision would set harmful precedent that conflicts with the CSO Policy.

AOMWA's members are particularly concerned that the District Court's decision will set harmful precedent that conflicts with the CSO Policy. The District Court's decision will open the door for U.S. EPA to take a position that cost considerations do not matter when dealing with CSO communities, in direct conflict

12

with its own CSO Policy. Section 402(q) of the CWA, 33 U.S.C. § 1342(q), mandates that consent decrees must conform to the CSO Policy, which was adopted in 1994 to establish "a consistent national approach for controlling discharges from CSOs to the Nation's waters through the National Pollutant Discharge Elimination System (NPDES) permit program." *See* CSO Policy, 59 Fed. Reg. at 18688. Here, when the District Court evaluated whether Akron's improvement into compliance with the CSO Policy was a significant change in circumstances, the Court conceded that it would *never* accept a modification with anything more than "zero overflows." (Doc.#390 at 8-9) ("Akron cannot achieve a result through its 60(b) motion that it could not have achieved through litigating the underlying matter to conclusion.").

If the City of Akron is required to construct the EHRT, U.S. EPA would have precedent to support seeking to require other communities in the future to be bound by consent decrees that are no longer cost effective or environmentally beneficial. This inflexibility would harm those utility communities and their ratepayers in numerous ways. First, as mentioned previously, it will divert necessary funds from other critical infrastructure projects. Second, those diverted funds will often result in projects that provide less environmental benefit for the community. Third, it will result in rate increases for the public for a project that is not providing environmental benefit. The CSO Policy was implemented with these and other concerns in mind, and neither the District Court nor the U.S. EPA should disregard its purposes. This

13

Court should reverse and remand, because the CSO Policy requires consideration of cost effectiveness, and failure to adhere to the CSO Policy will set a dangerous precedent for future consent decree modifications.

## CONCLUSION

For the reasons stated herein, AOMWA supports the City of Akron's request that the Court reverse the District Court's Order of March 1, 2024, denying the City of Akron's motion to modify the Consent Decree under Fed. R. Civ. P. 60(b)(5), and remand with instructions to approve the City of Akron's proposed modification to replace the existing obligation to design and construct a $209 million Enhanced High Rate Treatment Facility with the four alternative projects that, if adopted, will provide greater benefits for the water quality of the Cuyahoga River.

Dated: July 2, 2024 	Respectfully submitted,

  <u>/s/ D. Rees Alexander</u>
D. Rees Alexander (0090675)
Katherine E. Wenner (0100911)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, OH 43215
Telephone: (614) 365-2700
rees.alexander@squirepb.com
katherine.wenner@squirepb.com

*Attorneys for Association of Ohio Metropolitan Wastewater Agencies*

15

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of July, 2024, a copy of the foregoing *amicus curiae* Brief was filed electronically. Notice of this filing will be sent to all Parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

/s/ D. Rees Alexander
D. Rees Alexander